IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:10-CR-075-CAP-RGV

NOLEAN DUDLEY and
BRANDON DOBBS

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate

Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Crim. R.

58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be

served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of receipt of this

Order.  Should objections be filed, they shall specify with particularity the alleged

error(s) made (including reference by page number to the transcript if applicable)

and shall be served upon the opposing party.  The party filing objections will be

responsible for obtaining and filing the transcript of any evidentiary hearing for

review by the District Court.  If no objections are filed, the Report and

Recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 3rd day of February, 2011.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CRIMINAL CASE NO. |
| | 1:10-CR-075-CAP-RGV |
| NOLEAN DUDLEY and BRANDON DOBBS | |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Defendants Nolean Dudley ("Dudley") and Brandon Dobbs ("Dobbs") are charged in a single count indictment with maliciously damaging and attempting to destroy, by means of fire, a building located at 5231 Memorial Drive, DeKalb County, Georgia, in violation of 18 U.S.C. §§ 844(i) and 2.  [Doc. 1].  Dudley has moved to suppress statements he made to DeKalb County Fire Department ("DCFD") investigators and an agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATFE") during two interviews conducted on or about February 27 and March 3, 2008.[1]  [Docs. 25 & 35].  Dobbs has moved to suppress statements he made to ATFE agents during an interview conducted while he was hospitalized, as well as evidence obtained from a warrantless search of his cellular phone conducted

---

[1] Dudley also moved to suppress evidence seized from a residence, [Doc. 29], but this motion was withdrawn.  [Doc. 39].

by the ATFE agents during the interview. [Docs. 28 & 37]. Following an evidentiary hearing on the motions, the parties filed briefs on the issues raised by the motions, [Docs. 46, 48, & 49], and the matter is now ready for ruling.[2]  For the following reasons, the undersigned Magistrate Judge **RECOMMENDS** that Dudley's and Dobbs' motions to suppress evidence and statements, [Docs. 25, 28, 35, & 37], be **DENIED**.[3]

## I.  STATEMENT OF FACTS

**A.    February 27, 2008, First Interview of Dudley**

In February of 2008, Dudley was employed as an assistant manager of World Finance at the branch located on Memorial Drive in DeKalb County where the fire at issue in this case occurred.  (Tr. at 111-12).  Dudley, who worked under branch manager Al Henry ("Henry"), testified that when he came to work on February 27, 2008, Henry told him that "everybody would be going to speak to the detectives," and that if he didn't want to go, he would have to speak with Henry's superior, Scott

---

[2] See Doc. 43 for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the government submitted exhibits at the October 13, 2010, hearing, which will be referred to as "(Gov. Ex. ___)."

[3] Dudley and Dobbs also filed motions requesting a pre-trial hearing on the voluntariness of their statements pursuant to Jackson v. Denno, 378 U.S. 368 (1964), [Docs. 26 & 27], which are **GRANTED** by virtue of the hearing held on October 13, 2010.

2

Mozingo ("Mozingo").[4]   (Id.).   On the afternoon of February 27, 2008, DeKalb

County Fire Investigators Jack Archie ("Archie") and D.H. Nelson ("Nelson") met

with Dudley to interview him in a conference room located on the fourth floor of

DeKalb County Fire headquarters, located at 1950 West Exchange Place, Tucker,

Georgia.  (Tr. at 76-77, 112).  Archie described the room in which the interview was

---

[4] Henry testified differently, saying that he spoke with his superior, Patricia King, about staff from the Memorial Drive branch meeting with DCFD investigators, but he did not coordinate with any law enforcement personnel to arrange any meetings, and he did not order Dudley or any of the other staff to speak with DCFD investigators.  (Tr. at 45-47, 52).  Henry said that the Memorial Drive branch staff, including Dudley, were individually called directly by investigators, and that the individual staff members merely informed him of where they were going and why.  (Tr. at 48, 50, 53).  Dudley testified that he called Mozingo on the morning of February 27, 2008, and said he did not want to go speak with any detectives.  (Tr. at 112).  Dudley testified that Mozingo "[said] pretty much go or don't come back to World Finance."  (Id.).  Dudley stated that he would not have gone to the interview had he not been told he had to go.  (Tr. at 113).  Mozingo testified that he cooperated with DCFD investigators, providing the investigators with contact information for the employees at the Memorial Drive branch of World Finance.  (Tr. at 55-56).  Mozingo initially testified that he had not spoken to any World Finance employees prior to their interviews, but conceded on cross-examination that he was not sure if he had spoken to Dudley or not.  (Tr. at 58, 64).  On cross-examination, Mozingo said that if he had spoken to Dudley, or any other employee DCFD wished to interview, he "would have advised him to cooperate anyway he could help [sic]."  (Tr. at 64).  Captain Brad Gray ("Gray"), the lead DCFD investigator assigned to investigate the arson, testified that he contacted either Mozingo or "Ms. Walters" on February 25, 2008, and said that he would need DCFD investigators to speak with all of the individuals who had keys to the World Finance building on Memorial Drive.  (Tr. at 71, 74).  Gray testified that Mozingo told him that he would "see to it that everyone who worked at that location came in for an interview."  (Tr. at 75).

conducted as 18 by 18 feet, with a single door,[5] and a single window facing the parking lot.  (Tr. at 77, 99).  The interview was recorded, and Archie testified that Dudley was aware of this fact.  (Tr. at 76).  According to Archie, the purpose of the interview was to obtain background information on the day to day operations of the World Finance branch that had caught fire on February 25, 2008.   (Tr. at 78).[6] Dudley drove himself to the interview, (Tr. at 77-78, 84, 112), and this interview lasted approximately two hours.  (Tr. at 113).

Archie and Nelson did not advise Dudley of his <u>Miranda</u>[7] rights prior to interviewing him on February 27, 2008.  (Tr. at 81, 113-14).  Archie testified that Dudley did not appear to be under the influence of alcohol or drugs during the interview, that he appeared to have no difficulty understanding any questions asked, and that he had no difficulty understanding the answers Dudley gave in response to questioning.  (Tr. at 80-81).  While being interviewed, Dudley was not

---

[5] During the interview, the door was kept closed, except for when the interviewing law enforcement officers entered and exited. (Tr. at 100-01). Dudley was seated in a chair facing the door with the interviewing officers seated between him and the door.   (<u>Id.</u>).   The door was not locked, and at no time during the interview did Dudley attempt to get up to leave.  (Tr. at 107).

[6] In addition to Dudley, Archie and Nelson interviewed the other two individuals who had keys to the building: Brenda Diggs and Kaye Strange.  (Tr. at 70, 78).

[7] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)

placed under arrest or threatened with arrest, and he was not restrained, handcuffed, placed in a detention cell, or told that he could not leave.[8] (Tr. at 81-82). Archie and Nelson, though authorized to carry firearms, were unarmed during the interview. (Tr. at 81). Dudley did not refuse to answer any questions that were asked, and never asked to speak to a lawyer, though he did tell Archie and Nelson that a colleague of his, Diedre McClendon, had told him that she was going to talk to a lawyer. (Tr. at 82-83).

During the course of the interview, Dudley told Archie and Nelson that he was 23 years old, that he had a G.E.D., and that he had served in the military. (Tr. at 79-80). Dudley did not indicate that he had any adult experience with the criminal justice system. (Tr. at 80). Archie and Nelson asked Dudley to "help[] [them] figure out what happened," and Dudley responded that he "can't help . . . with something [he] [didn't] know." (Tr. at 83). At the conclusion of the interview, Archie and Nelson verified that they had Dudley's telephone number, and Dudley left. (Tr. at 83-84).

---

[8] Dudley was also not explicitly told that he was free to leave during the interview, or that he would be allowed to leave at the interview's conclusion. (Tr. at 102-04).

5

**B.      March 3, 2008, Second Interview of Dudley**

Archie and ATFE Special Agent John Paul ("Agent Paul")[9] conducted a
second interview of Dudley on March 3, 2008, in the same location as the first
interview: the conference room located on the fourth floor of DCFD headquarters.
(Tr. at 85-86).  The interview was again recorded, and Archie testified that Dudley
was aware of this fact.  (Tr. at 85).  Dudley again drove himself to the interview, after
allegedly being told to go by both Henry and Mozingo.[10]  (Tr. at 85, 114-15).  DCFD
investigators photographed his vehicle after he arrived.  (Tr. at 85-86).  Prior to
interviewing Dudley, Archie advised Dudley of his Miranda rights by reading from
a written Miranda form, and Dudley gave a verbal waiver of those rights after
Archie asked if he understood those rights, and if he wished to continue the
interview.[11]  (Tr. at 86-87, 115-16; Gov. Ex. 2 at 1-2).  In addition to giving a verbal

———————————————

[9] Dudley testified that there were three agents present, "the same detectives
from the first time" in addition to a federal agent, though Archie testified that only
he and Agent Paul were present.  See (Tr. at 115).

[10] Dudley testified that he contacted Mozingo after being told by Henry to go
to DCFD for a second interview, and Mozingo told him that if he did not go, he did
not have to come back to work.  (Tr. at 115).  Both Henry and Mozingo testified
differently as described supra note 4.

[11] Specifically, Archie gave Dudley the following advisement from a
standardized Miranda form:

Okay, Mr. Dudley, this is your statement of Miranda rights.  Are you
familiar with that, with Miranda?  Okay.  You have the right to remain

waiver, Dudley gave a written waiver of his <u>Miranda</u> rights by initialing the form next to each of five advisements, and by signing his name at the end of the waiver portion of the form.  (Tr. at 86-88, 115-16; Gov. Ex. 2).

During the second interview, as in the first, Dudley was not placed under arrest and was not threatened with harm, handcuffed, placed in a detention cell, or

––––––––––––––––––––

> silent.  Anything you say and [sic] will be used against you in a court of law.  You have a right to have a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.  Do you understand that, what I just read to you?

(Tr. at 87; Gov. Ex. 2 at 1).  Dudley responded "yeah," whereupon Archie read to him the waiver portion of the form:

> Now this is waiver of rights.  I have read the above statement of my rights and I understand each of those rights.  Having these rights in mind, I waive them and willfully make a statement.  You understand what I read to you right, one through five?  You want to make a statement and talk to us now, continue the interview?

(Tr. at 87-88; Gov. Ex. 2 at 2).  To this question, Dudley also responded "yeah."  (Tr. at 88).  Dudley testified at the hearing that he did not understand his rights, (Tr. at 116-17), but admitted on cross-examination that he was fluent in English, had a G.E.D., and that he understood what it meant to be silent, what an attorney is, what court is, what afford means, what hire means, what questioning is, what the word "answer" means, what the phrase "not answer" means, and what it means when somebody says that "you have the right not to answer questions."  (Tr. at 119-20).

told that he could not leave.[12]  (Tr. at 88-89, 91).  Dudley did not refuse to answer any

questions that were asked, and did not request to speak to a lawyer.  (Tr. at 88, 91,

122).   Agent Paul informed Dudley that the maximum penalty for arson was

"twenty years," and that if Dobbs were to die, there could be a murder prosecution.

(Tr. at 88-89, 123).  Archie and Agent Paul informed Dudley at one point that they

"had enough to arrest him, but they weren't going to do so that day."  (Tr. at 89, 120-

21; Gov. Ex. 2 at 45).   Archie and Agent Paul asked Dudley if he was worried about

going to jail, and Dudley said he was worried about "losing his job" more than jail.[13]

(Tr. at 90, 120-21, 124).  Archie and Agent Paul also said they would try to get a

sentence reduction for Dudley if he admitted his involvement in the arson, and that

they would try to keep the case local rather than let it be prosecuted by the Federal

authorities.  (Tr. at 90-91).  Dudley never admitted to being involved in the arson.

(Tr. at 91).  Archie and Agent Paul asked Dudley if he would take a polygraph, and

---

[12] Dudley indicated during the interview that he believed he was free to leave because in response to Archie asking him what his mother would think of this, Dudley responded, "I am going to call and talk to her when I leave."  (Tr. at 93-94, 121; Gov. Ex. 2 at 67-68).

[13] Dudley confirmed that he told Archie and Paul that his biggest fear was losing his job, and that without his job he didn't "have anything else to go to . . . without my job, I would have just been finished."  (Tr. at 124-25).  He also testified that Mozingo was "over my boss and over my boss's boss," and had the ability to terminate his employment. (Tr. at 124).  Mozingo testified that he was vice president of operations for World Acceptance Corporation (World Finance's parent company) in the state of Georgia.  (Tr. at 54).

Dudley refused.  (Tr. at 91, 123).  Dudley did not make any admission about setting the fire, and when the interview was concluded,[14] Dudley left, and drove himself away from the DCFD headquarters.  (Tr. at 93, 123).

## C.   February 28, 2008, Hospital Interview of Dobbs

ATFE Special Agent Allen McLeod ("Agent McLeod") testified that, while investigating the arson, he and Special Agent David Diaz ("Agent Diaz") went to Grady Memorial Hospital on February 28, 2008, to determine whether any individual with suspicious burns had been admitted to the hospital after the fire at World Finance.  (Tr. at 6-7).  Upon checking with the reception desk, Agent McLeod learned that Dobbs had been admitted to the burn unit shortly after the fire occurred[15] with significant burns to his upper torso, arms, and face.  (Tr. at 7).  Hospital staff told Agents McLeod and Diaz where Dobbs was located, and

---

[14] At some point during the interview, Dudley said "I guess I'm ready to leave," (Gov. Ex. 2 at 70), but the interview continued.  However, the government is not seeking to introduce any statements made after this point, [Doc. 46 at 9 (citing (Tr. at 95))].

[15] Hospital records show that Dobbs came to the hospital on February 26, 2008, at 11:44 p.m., and was admitted on February 27, 2008, at 1:00 a.m.  (Gov. Ex. 3). Dobbs was noted in hospital records as being in "constant" pain rated at a 9 on the VAS pain scale at the time of admittance.  (Gov. Ex. 1).

indicated they could speak with him, and the agents went to his room where Dobbs was lying in bed.[16]  (Tr. at 31, 36).

Hospital records show that on February 28, 2008, Dobbs was given the following medications: acetaminophen, morphine sulfate, oxycodone-acetaminophen, and promethazine, which the records indicated may cause drowsiness or dizziness.  (Gov. Ex. 3).[17]  The hospital records also show that on February 28, 2008, medical staff checked on Dobbs' condition three times, at 1:00 a.m., 8:00 a.m., and 3:30 p.m., noting on each occasion that Dobbs was "calm" and "oriented."[18]  (Gov. Ex. 3).  Agents McCleod and Diaz were not aware of the types of medications that Dobbs was receiving.  (Tr. at 9, 27).  Agent McCleod testified that while Dobbs was speaking with the agents he was "very coherent," appeared to understand the questions asked well enough to answer them, did not slur his

---

[16] Agent Mcleod testified that he first saw Dobbs walking past him down the hallway with a saline bag, but because he did not know who Dobbs was, he did not contact him.  (Tr. at 6, 36-37).

[17] Hospital records also show that Dobbs was catheterized at the time of the interview, (Gov. Ex. 3), though Agent McCleod testified he was not aware of this, only that Dobbs had an IV and bandages, (Tr. at 24).

[18] The relevant form included an area with check-boxes to record a patient's level of anxiety, with allowable ratings of "calm," "mild," "moderate," "panic," and "sedated."  (Gov. Ex. 3).  The form also included check-boxes to record a patient's level of consciousness, with allowable ratings of "oriented," "lethargic," "confused," "agitated," and "comatose."  (Id.).

speech, and did not ask for medical attention at any time during the interview.  (Tr. at 9-10, 14, 37).  Agent McCleod testified that he had experience interviewing burn victims, and that he would conduct an interview only if the person was "able to give a coherent answer and understand our questions and know what time it is, what day it is, where they are and what is going on."  (Tr. at 29).

At the outset of the interview, Agent McLeod asked Dobbs how he was doing, and Dobbs responded that he was "doing fine."  (Tr. at 10).  The agents then proceeded to ask other questions, which Dobbs answered.  (Id.).  Dobbs was never handcuffed, placed under arrest, threatened, beaten, abused, or forced to respond to any questions.  (Tr. at 10-11).  Agents McLeod and Diaz were armed at the time they interviewed Dobbs, but their firearms were concealed by their clothing.  (Tr. at 36).  Agent McLeod testified that he did not inform Dobbs of his Miranda rights because "he was not in any type of custody" and they "were just there to talk with him."  (Tr. at 8).  He further testified that Dobbs' aunt, who was present during part of the interview, was "freely allowed to walk to and from the room," that Dobbs "had every right to go to the bathroom if he needed to," and "there was in no way that he was in any kind of custody."  (Tr. at 14-15).

Dobbs never asked the agents to leave, nor did he refuse to answer any questions.  (Tr. at 16).  Dobbs told the agents that he had been burned during a drug

11

deal that had gone bad wherein he had been forced into the trunk of a vehicle at gunpoint by an individual name "Cacalaki," doused with gasoline, and set on fire. (Tr. at 13).  During the interview, Dobbs answered both his cellular phone, and the phone in his hospital room.  (Tr. at 15-16, 37).  When Dobbs' aunt asked the agents to come back later so she could spend time talking with Dobbs, Agents McLeod and Diaz left.  (Tr. at 15-16).

While speaking with Dobbs, the agents asked him for consent to look at the contents of his cellular phone.  (Tr. at 11).  Dobbs responded by handing his phone to Agent Diaz, who handed it to Agent McCleod to look through.  (Tr. at 11, 15, 32-35).  While handing the phone over, Dobbs said "You are only going to look at my missed call list."  (Tr. at 15).  Dobbs then moved to get out of bed in order to watch Agent McCleod's search of the phone.  (Tr. at 11-12).  Agent McCleod looked at the missed calls listed on Dobbs' cellular phone, but while navigating to the missed calls display, he noticed there were some text messages on the phone.  (Tr. at 32-35).  Agent McCleod testified that, given the interface of the phone, it was not possible for him to navigate to the missed calls display without navigating through the text message display.  (Id.).  Agent McCleod said that he "got there [to the missed calls] as fast as [he] could" and did not read the content of any of the text messages.  (Tr. at 35).

## II.  DISCUSSION

Dudley and Dobbs challenge the admissibility of statements they made during interviews with law enforcement agents on the grounds that the statements were obtained in violation of their constitutional and <u>Miranda</u> rights.  Dobbs also challenges the warrantless search of his cellular phone.  The government argues that the statements made by Dudley and Dobbs in response to questioning were lawfully obtained due to the fact that neither Dudley or Dobbs were questioned under circumstances where <u>Miranda</u> advisements were required.[19]  The government also maintains that Agent McLeod lawfully viewed the contents of Dobbs' cellular phone pursuant to his consent.

## A.    Interviews of Dudley on February 27 and March 3, 2008

"<u>Miranda</u> warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal marks and citation omitted).  "Custody" for purposes of triggering <u>Miranda</u> advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>United States v. Brown</u>, 441 F.3d 1330, 1347

---

[19] Nonetheless, <u>Miranda</u> advisements were given prior to Dudley's second interview on March 3, 2008, and the government argues that those advisements were properly given, and a waiver properly obtained.

(11th Cir. 2006) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)) (internal marks omitted).  Whether or not a suspect is "in custody prior to his formal arrest depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." <u>Id.</u> (quoting <u>United States v. McDowell</u>, 250 F.3d 1354, 1362 (11th Cir. 2001)) (internal marks omitted).  The standard is objective in that the actual subjective beliefs of officer and defendant are irrelevant:  custody exists only if a reasonable person under the same set of circumstances would not feel free to leave.  <u>Id.</u> (citing <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)).  "Thus, '[t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings.'" <u>United States v. Phillips</u>, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam) (quoting <u>Minnesota v. Murphy</u>, 465 U.S. 420, 431 (1984)).

Dudley contends that he was ordered to speak with DCFD investigators by his superiors, and that he was afraid that he would lose his job if he did not, but even so, considering the totality of the circumstances attendant in each interview, Dudley was not in "custody" for purposes of <u>Miranda</u> advisements.  Dudley drove himself to both interviews, and was allowed to leave.  He was never arrested, placed in handcuffs, told he could not leave, or physically restrained in any way.  Even

though the interviews took place at DCFD headquarters, the room in which the interviews were conducted was a conference room at the fire department headquarters, and not a secure custodial or police facility. The investigators conducting the interviews were unarmed, and no one displayed a weapon or threatened Dudley in any manner. Consideration of the totality of the circumstances of each interview persuades the Court that Dudley's motion is due to be denied.

### 1. February 28, 2008 Interview

Dudley cites nothing coercive about the circumstances surrounding the first interview of February 28, 2008, except for the fact that he feared he would lose his job if he did not cooperate with the DCFD investigators. However, this is insufficient to create a custodial interrogation requiring that <u>Miranda</u> warnings be given. <u>Cf.</u> <u>United States v. Muegge</u>, 225 F.3d 1267, 1269-71 (11th Cir. 2000) (per curiam) (no custody where defendant was directed by supervisor to speak with investigators at a secure site in an interview room with the door closed, where he was interviewed for approximately two and half hours, and was not formally arrested until eight months later). Though <u>Muegge</u> is distinguishable in that the defendant in that case was advised that he was free to leave, this one factual difference does not tip the balance of the totality of circumstances in favor of custody, especially where, in other respects, the circumstances in this case are less

15

coercive than those in <u>Muegge</u>.[20]  <u>See</u> <u>United States v. Mahan</u>, 190 F.3d 416, 422 (6th

Cir. 1999) (concluding that under similar circumstances where defendant was not

advised that he was free to leave, "it is simply of no moment that Mahan had been

summoned to the interview by one of his supervisors at work, or that [the

interviewing agent] told him that giving false information during the interview

would be a serious matter[;] . . . [n]either fact even remotely constitutes a restraint

on the freedom of movement to the degree associated with formal arrest.").  <u>See also</u>

<u>United States v. Dockery</u>, 736 F.2d 1232, 1234 (8th Cir. 1984) (en banc) (holding that

defendant was not in custody under similar circumstances where she "was directed

by her employer to meet with the agents" and noting that "[o]rdinarily, when people

are at work their freedom to move about has been meaningfully restricted, not by

the actions of law enforcement officials [sic], but by the workers' voluntary

---

[20] The defendant in <u>Muegge</u> was a civilian employee of the United States Air Force who was interviewed in a secure facility by the Air Force Office of Special Investigations ("OSI"). 225 F.3d at 1268-69.  Though the defendant "left the building twice during the interview for cigarette breaks; he was accompanied by at least one OSI agent, who did not smoke." <u>Id.</u> at 1269.  Here, Dudley knew he was one of several employees being interviewed, not necessarily as a suspect in an investigation, his employer was a private company, not a branch of the federal government, and he was interviewed by fire investigators at a fire station, not by military police at a secure on-base facility.  <u>See also</u> <u>Purvis v. Dugger</u>, 932 F.2d 1413, 1419 (11th Cir. 1991) (defendant not in custody where he "voluntarily went to the police station and was never placed under arrest or restrained in any way during his initial interview[,] . . . left the interrogation room at one point to get a drink of water[,] . . . never requested a lawyer during the interview and never asked . . . to terminate the interview" and "never asked to go home until after he confessed").

obligations to their employers.") (citation and internal marks omitted).  Thus, even if Dudley was in fact ordered by his superiors to attend the interview with DCFD, "such an order, absent other coercive elements, did not constitute the type of restraint on [Dudley's] freedom associated with a formal arrest." <u>Muegge</u>, 225 F.3d at 1270; <u>Brown</u>, 441 F.3d at 1347.  Considering all of the circumstances surrounding the first  interview on February 28, 2008, Dudley was not "in custody" while being questioned, therefore <u>Miranda</u> advisements were not necessary.[21]

2.  *March 3, 2008, Interview*

Dudley's second interview was similar in some respects to his first interview, but Archie and Agent Paul were more aggressive in their questioning during the second interview and focused on Dudley as a potential suspect.  However, in light of prevailing case law, the addition of these factors is not enough to create a level of restraint equivalent to arrest.  <u>Brown</u>, 441 F.3d at 1347.  Agent Paul told Dudley that he was a suspect in the arson, informed him of the maximum penalty for that offense, and said that they "had enough to arrest him."  (Tr. at 89, 120-21; Gov. Ex. 2 at 45).  However, Agent Paul also said that they "weren't going to do so that day."

---

[21] Even though Dudley points out that Gray contacted Mozingo in order to arrange the interviews, there is nothing in the record to suggest that Gray had instructed Mozingo to discipline or fire employees who refused to cooperate.  Gray testified that he "informed [Mozingo] that we wanted to talk to everybody that worked at that location," and that "if anyone didn't come in, usually we would make an effort to track them down to do an interview."  (Tr. at 73-74).

(Gov. Ex. 2 at 45).  Cf. United States v. Leese, 176 F.3d 740, 744 (3rd Cir. 1999) (defendant not "in custody" where she was ordered to an interview by her employer and investigators informed her that "when the questioning was concluded the inspectors would be returning to Harrisburg and she would not be going with them" even though "[a] significant portion of the questioning was in the typical police interrogation mode, confirming [defendant's] knowledge of Post Office procedures, confronting her with the found discrepancies in her accounts, asking her point blank as to whether she committed the crime, challenging her answers, and attempting to discover the details of the crime").  See also Yarborough v. Alvarado, 541 U.S. 652, 661 (2004) (noting that questioning was not custodial because there was "no indication that the questioning took place in a context where [defendant's] freedom to depart was restricted in any way" where investigating officer arranged to meet defendant at a nearby police station, stated a belief that the defendant was involved in a burglary, but that he was not under arrest, and defendant was allowed to leave at the end of the interview after confessing) (analyzing and quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)); Phillips, 812 F.2d at 1360-61 ("[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive

18

environment,'" and "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings") (internal marks and citation omitted) (alterations in original).

The circumstances presented to Dudley during the interview would make it clear to a reasonable person that he was a suspect in an investigation, and perhaps would be arrested in the future, but at that point, he was free to leave or otherwise refuse to cooperate.  See id.  The conclusion that a reasonable person in Dudley's position would believe that he was not in custody finds support in Dudley's own statements during the interview that he would tell his mother about the interview after he left, and toward the end of the interview, when he told the investigators that he was "ready to leave." (Tr. at 93-94, 121; Gov. Ex. 2 at 67-68, 70).  The totality of evidence before the Court shows that a reasonable person in Dudley's position would not consider himself restrained in a manner equivalent to arrest; therefore, Dudley was not "in custody," and Miranda advisements were not required prior to questioning.

Nonetheless, even if Dudley were "in custody" for Miranda purposes during the second interview, the statements at issue that he made in this interview are admissible because he was given proper Miranda advisements, and the government has shown that he properly waived his rights before making the statements.  See

19

United States v. Woods, No. CR 109-127, 2010 WL 1688576, at *10 (S.D. Ga. Mar. 24, 2010), adopted by 2010 WL 1688570, at *1 (S. D. Ga. Apr. 26, 2010).   Prior to questioning a defendant in custody, investigators are required to fully advise him of their intention to use his statements to secure a conviction, and inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Miranda, 384 U.S. at 468-70.   Furthermore, in order for any statements in response to questioning to be admissible, investigators are required to obtain a voluntary, knowing, and intelligent waiver of those rights prior to questioning.  Id. at 444.

> Whether a waiver is valid has two distinct dimensions:
>
> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)).  See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The voluntariness analysis

often depends on whether "the defendant's will was overborne." <u>Lynumn v.</u> <u>Illinois</u>, 372 U.S. 528, 534 (1963). "[C]oercive police activity is a necessary predicate" to finding a waiver involuntary. <u>Connelly</u>, 479 U.S. at 167. <u>See also</u> <u>Moran</u>, 475 U.S. at 421 ("[T]he relinquishment of the [<u>Miranda</u>] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."). "[I]n the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary." <u>United</u> <u>States v. Minard</u>, 208 Fed. App. 657, 660 (10th Cir. 2006) (unpublished).

"In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." <u>Id.</u> In contrast to a finding of voluntariness, the court "need not find coercion in order to find a defendant's waiver unknowing or unintelligent." <u>Id.</u> (citation omitted). The government bears the burden of proving by a preponderance of evidence that a defendant validly waived his <u>Miranda</u> rights. <u>United States v. Chirinos</u>, 112 F.3d 1089, 1102 (11th Cir. 1997). <u>See also</u> <u>Connelly</u>, 479 U.S. at 168-69. Whether a suspect knowingly and intelligently waived his rights depends on the particular circumstances in a case, including the background, experience, and conduct of the defendant; the defendant's age; familiarity with the criminal justice system; and his demeanor and conduct during the interrogation. <u>See</u>

<u>Edwards</u>, 451 U.S. at 482; <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1426-27 (11th Cir. 1994).

"No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." <u>Patterson</u>, 2007 WL 2331080, at *3. "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" <u>Minard</u>, 208 Fed. App. at 660 (quoting <u>Moran</u>, 475 U.S. at 421). "'A waiver is knowing and intelligent only if it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" <u>United States v. Wattree</u>, 544 F. Supp. 2d 1262, 1274 (D. Kan. 2008) (quoting <u>Minard</u>, 208 Fed. App. at 660) (internal marks omitted). Thus, "'[a] defendant need not . . . understand all the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him.'" <u>Id.</u> at 1274-75.

Dudley waived his rights verbally and by initialing and signing the <u>Miranda</u> form after the form was placed in front of him, and after its contents had been read aloud to him. (Tr. at 29-30, 89-90). <u>See</u> <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010) ("A signed *Miranda* waiver is usually strong evidence that the defendant waived his rights, but it is not necessary"); <u>United States v. Couch</u>,

No. 03-172-N, 2004 WL 419903, at *5 (M.D. Ala. Feb. 5, 2004) (prior to being questioned, defendant was advised of his rights and "initialed a form indicating that he understood each of his *Miranda* rights," which "is sufficient to satisfy both the *Miranda* requirement and the voluntariness requirement") (citing United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam)).   No one threatened or intimidated Dudley prior to his being advised of his rights, and there is no evidence that anyone deceived Dudley or made any promises to induce him to sign the waiver.[22]  (Tr. at 34-35).  See Connelly, 479 U.S. at 167.  Dudley told the agents that he understood his rights, initialed the form next to each of the rights after they were read, verbally confirmed that he understood each right, said "yeah" when asked if he wanted to continue the interview, and signed the waiver portion of the form after

---

[22] Though Dudley argues that he was coerced to make statements under fear of being fired, see [Doc. 49 at 10], no such threat was made.  Though Dudley argues that he felt compelled to go to both interviews under fear of being fired, no one either expressly or impliedly told him that he needed to waive his Miranda rights or be fired.  Indeed, the text of the Miranda warning read to him stated that he had the *right* to remain silent, and Agent Paul asked him if he "want[ed] to make a statement and talk to us now, continue the interview?"  (Tr. at 87-88; Gov. Ex. 2 at 2).  To this, Dudley simply responded "yeah" without objecting or asking any clarifying questions as to whether he had to make a statement in order to keep his job.  (Id.).  Furthermore, though Agent Paul told Dudley about the maximum penalties for arson, that there might be a murder investigation, and that he would try to keep the case local if Dudley cooperated, these statements came after the Miranda waiver had been signed.

it was read aloud.  Thereafter, he made statements, and never asked for counsel, or refused to answer questions.

Even though Dudley testified that he did not understand his rights, and he argues that he has no experience with the criminal justice system, his age, education, and work experience[23] show that he is a normally functional working adult, able to read and understand English, and is therefore capable of comprehending the rights read to him from the Miranda form.  When cross-examined regarding which portion of the Miranda form Dudley did not understand, Dudley's testimony reflected that he did in fact understand all of the relevant portions of the Miranda form.  See (Tr. at 119-20).  Dudley's motion to suppress statements made during his second interview is therefore without merit because he was not in custody when interviewed, and even had he been in custody, Miranda warnings were properly provided and he knowingly and voluntarily waived his rights before he was questioned.  The undersigned therefore **RECOMMENDS** that Dudley's motions to suppress his statements made in both interviews, [Docs. 25 & 35], be **DENIED**.

**B.      Hospital Interview of Dobbs**

---

[23] Dudley testified that he worked at World Finance as an assistant manager, and that he performed duties including loan processing, tax preparation, and debt collection, (Tr. at 116-17), all of which require literacy and some familiarity with legal concepts, albeit unrelated to criminal law and procedure.

Dobbs challenges the admissibility of his statements made to Agents McCleod and Diaz while he was hospitalized as well as the admissibility of evidence obtained from his cellular phone during the course of this interview on grounds that his medicated state and restricted mobility invalidated both his statements and his consent.

## 1.   *Admissibility of Dobbs' Statements*

Because Dobbs was not in custody, there is no basis to suppress the statements he made to Agents McCleod and Diaz as a violation of <u>Miranda</u>.  As already discussed, "custody" for <u>Miranda</u> purposes exists only when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Brown</u>, 441 F.3d at 1347.  Given that Dobbs was never placed under arrest, the question is "whether under the totality of the circumstances, a reasonable man in [Dobbs'] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." <u>Id.</u>

Here, none of the trappings of custody were present while Agents McCleod and Diaz questioned Dobbs.  The agents came to the hospital during normal hours, and asked hospital staff if they could speak with Dobbs.  Although the agents were armed, their firearms were concealed, they did not handcuff or restrain Dobbs' movements, Dobbs' aunt was allowed to enter and leave as she pleased, and the

agents left when asked to do so by Dobbs' aunt.  The agents made no threats or promises, and in no way exerted any authority or control over Dobbs.

Dobbs cites Mincey v. Arizona, 437 U.S. 385 (1978), in support of his argument that statements he made while he was heavily medicated were a violation of his constitutional rights.  However, Mincey is inapposite as it involved a situation in which a largely incapacitated murder suspect was placed under arrest, informed of his Miranda rights, and then questioned by a detective at his bedside late into the night.  Id. at 396.  Unlike Mincey, Dobbs was never in custody, placed under arrest, or informed of his Miranda rights, therefore the issue of the voluntariness of any Miranda waiver raised by Dobbs in his brief is irrelevant. See United States v. Martin, 781 F.2d 671, 674-75 (9th Cir. 1985) (rejecting defendant's identical argument on similar facts).

Law enforcement agents may approach an individual and ask questions without invoking Miranda if that individual is not in custody, even if that individual is in the hospital undergoing treatment.  See United States v. Robertson, 19 F.3d 1318, 1320-21 (10th Cir. 1994) (confession obtained by FBI agents who interviewed defendant in the hospital at his bedside while defendant was recuperating from a "serious head injury" and coma was admissible where no Miranda warnings were given, defendant was not restrained by the agents, and the defendant was "free to

check himself out of the care center"); <u>Martin</u>, 781 F.2d at 674 (hospitalized defendant not "in custody" for purposes of <u>Miranda</u>).  Furthermore, though the hospital records reflect that Dobbs was suffering from pain from his burns, and was being administered pain medication, those records also reflect that he was consistently "calm" and "oriented."   Agent McCleod's testimony reflects that hospital staff allowed the agents to speak with Dobbs, that they were allowing Dobbs to walk unaccompanied to the bathroom (which Agent McCleod observed), and receive phone calls and visitors.  Dobbs was awake and alert, able to get out of the bed and walk, converse on the phone, answer the agents' questions, give (and limit) consent to search his cellular phone, and appeared to Agent McCleod to be "very coherent."  Under such circumstances, it does not appear, as Dobbs argues, that "his will was simply overborne."  <u>See</u> <u>Martin</u>, 781 F.2d at 674  ("although the defendant was injured and under medical care at the time the statements were made, the type, dosage, and schedule of painkilling narcotic administered to [defendant] was not sufficient to overbear his will to resist the questioning or impair his rational faculties").  The undersigned concludes that Dobbs' statements were voluntarily given, and therefore **RECOMMENDS** that Dobbs' motion to suppress his statements made to Agents McCleod and Diaz, [Doc. 27], be **DENIED**.

     **2.**    *Admissibility of Cellular Phone Evidence*

27

"[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth, 412 U.S. at 219 (quoting Katz v. United States, 389 U.S. 347, 357 (1967) & Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971)). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). See also Schneckloth, 412 U.S. at 219; United States v. Reynolds, 526 F. Supp. 2d 1330, 1336-37 (N.D. Ga. 2007); United States v. Dunkley, 911 F.2d 522, 525 (11th Cir. 1990) (per curiam). "The determination as to whether a suspect's consent is voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

The Eleventh Circuit has listed relevant factors to be considered in evaluating whether a defendant's consent is voluntary, including:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

Id. (quoting United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984)). The government bears the burden of showing that consent to a warrantless search was

28

freely and voluntarily given.  United States v. Acosta, 363 F.3d 1141, 1151 (11th Cir. 2004); Blake, 888 F.2d at 798.  Here, the government has carried its burden by showing that Dobbs freely and voluntarily consented to a limited search of his cellular phone.

Examining each of the factors enumerated in Blake in turn, Dobbs was hospitalized after checking himself in, and no law enforcement authority was detaining him or preventing him from leaving.  As discussed, he was not under arrest or restrained, nor were his movements otherwise restricted by Agents McCleod or Diaz at any time during the interview.  Neither Agents McCleod or Diaz used any show of force, threat, or promise to coerce him into giving consent to search his phone; they merely asked for consent.   Dobbs was responsive, cooperative, and communicative throughout the entire interview, and though Agent McCleod testified that Dobbs "reluctantly" gave his phone to the agents to search, he gave the phone over after placing a restriction on the scope of his consent, limiting the agents to a search only for missed calls.  After placing this restriction, Dobbs then got out of bed to watch Agent McCleod's search of the phone.  Though the agents never formally advised Dobbs of his right to refuse, such an advisement is not necessary, and the lack of it does not render consent involuntary.  United States v. Zapata, 180 F.3d 1237, 1241-42 (11th Cir. 1999).  Furthermore, Dobbs' actions in limiting the scope of the search and then observing the search to ensure

29

that the agents complied with his limitation indicate that he not only knew he had authority to refuse consent, but that he was lucid enough to place intelligent restrictions on the scope of the search and take appropriate action to enforce those restrictions.

Dobbs also challenges the admissibility of any information gleaned from the text messages Agent McCleod noticed as he navigated to the missed call display. While it is clear that a warrantless search conducted pursuant to consent must remain within the scope of the consent given, United States v. Street, 472 F.3d 1298, 1308-09 (11th Cir. 2006), nothing in the facts of this case suggest that Agent McCleod exceeded the scope of Dobbs' consent.  Agent McCleod testified that he navigated to the missed call display as directly as possible, that it was necessary for him to navigate through a display of text messages in order to get to the missed call display, and while navigating, he did not view the content of any of the text messages.  Agent McCleod's actions are analogous to those of an officer walking through exterior areas of a home in order to access an interior room in a residence that he has been granted consent to search.  Any information Agent McCleod saw incidentally while conducting the search within the scope of consent is admissible because it was in plain view on his path as he navigated to the display of missed calls directly from the screen which Dobbs had on display when he handed the phone to the agents.  See Georgia v. Randolph, 547 U.S. 103, 1536-37 (2006) (where

30

"police [are] lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause") (citing <u>Texas v. Brown</u>, 460 U.S. 730, 737-39 (1983)); <u>United States v. Simpson</u>, 259 Fed. App. 164, 167 (11th Cir. 2007) (per curiam) (unpublished) (where defendant's "consent was voluntary and the officers' actions did not exceed the limitations of that consent, the officers were entitled to rely on any evidence they observed in plain view while inside the house.").  Furthermore, since Dobbs handed the phone to Agents Diaz and McCleod with the interface in such a configuration that navigating through the text message display was necessary, his consent for the agents to view what they did while navigating to the missed call screen was implied. <u>See, e.g.</u>, <u>United States v. Ramirez-Chilel</u>, 289 F.3d 744, 751 (11th Cir. 2002) (consent to enter and search residence implied by defendant's "yielding the right-of-way" at the front door after officers asked to enter).  It is therefore **RECOMMENDED** that Dobbs' motion to suppress evidence arising from Agent McLeod's viewing of the contents of his cellular phone on grounds that the search thereof was in violation of his Fourth Amendment rights, [Doc. 28], be **DENIED**.

## III. CONCLUSION

For the foregoing reasons and cited authority, the motions requesting a <u>Jackson v. Denno</u> hearing are **GRANTED**, [Docs. 26 & 27], and the undersigned

**RECOMMENDS** that the motions to suppress evidence and statements, [Docs. 25, 28, 35, & 37], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 3rd day of February, 2011

_Russell G. Vineyard_

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE